Good morning. May it please the Court. My name is David Weinstein for the appellant, Christopher Barclay, in his capacity as trustee in bankruptcy. This case, Your Honors, is primarily about applying precedent for this Court to the proverbial next case in line. I have a separate line of questions that I want to get to early on because it really has gave me trouble trying to figure out what your case was about, and that really has to do with who were the creditors we're talking about here. I mean, much of your argument highlighted the distinction between investors, equity, and real debt, and yet we're told that we're talking like $100 worth of debt by creditors who, unsecured creditors, who actually don't stand to collect that. Who are we talking about here? Are there real creditors here, or are you talking about redistribution amongst investors? Well, I'm hesitating for the following reason. This Court, in another line of cases that is widely accepted, excuse me, let me answer another way. The reference that you heard that you saw in the briefs to $100 and something like that is really a reference to what are sometimes commonly called the shoes creditors, because 544B of the Bankruptcy Code calls upon a trustee in bankruptcy who's trying to invoke that statute to identify at least one actual creditor who could have attacked the transfers. And under Moore v. Bay, which is a Supreme Court from quite some time ago, 1931, it's been widely recognized that it takes only one creditor of any amount of money who could have under state law, pre-petition, attacked the transfer, to allow the trustee in bankruptcy to bring the action. And under Moore v. Bay and lots of projects... I asked a slightly different question, which is that you've made arguments that emphasize the difference between investors and trade creditors, between equity and debt in some fashion. And yet, in fact, who's going to collect the money? And it sounds like what we're faced with is a proposed redistribution amongst investors. I was intending to come to that. The prelude was a reference. Your Honor also asked me about the $100 reference. The $100 reference, and that's a round, conversational reference, is to the shoes creditor. The true body of creditors, quite candidly, I don't know off the top of my head. That's simply a circumstance as to what the bankruptcy estate has to deal with. Well, that may mean the argument you've made to us about the importance of distinguishing between investors and trade creditors is purely hypothetical, because you don't know if there are any trade creditors here. No, with due respect, it arises in a different manner. It comes into play. The argument that we've made comes into play in how the avoiding powers are simply applied and what the underlying precepts are for how the avoiding powers are constructed and why they're applied in a certain way. What the body of creditors is in a given case doesn't drive what the theory is of how the avoiding powers apply as a general matter. The discussion we focused on, which is what this quarter, the other panel, the prior panel that my circuit focused on in Agritech, was the distinction between equity investors or equity holders, including the frauded ones, and creditors for purposes of how the avoiding powers are constructed and applied. That's a very different application. You don't know that there are any creditors here. I don't know that there are any creditors here. Well, I do know that there are creditors of the estate, including administrative creditors. Okay. And that's another point that the ---- So the proceedings are being conducted for the benefit of those that are conducting the proceedings. I'm sorry I didn't say that, Your Honor. And I apologize that I don't know the exact list of allowed ---- I'm not asking you for a list. I'm saying is there anybody really home? I mean, knock on this door, and you've got very clearly stated by opposing counsel an argument that says, look, there's nobody there. This thing is all make-weight. And I don't hear from you anything that gives me confidence to know there really is anybody there. Well, Your Honor, that issue, that problem, if it's a problem, goes to ---- that goes to things like compensation to professionals with the money, what should be done with the money. That doesn't go to whether ---- I beg to differ. If you've made an argument that emphasized how investors are last in line, you better tell me that there are other people in line other than investors. And so far, you're unable to do that. Your Honor, I'm only unable to do that because I don't have the particulars of literally the ---- Well, you sat here a few minutes ago and watched us talk to an attorney that had five years to find out whether his client was prejudiced and couldn't tell us. I can't tell you that your answer is a whole lot more satisfying that you don't know whether there are any real creditors there. Your Honor, the reason that I don't have that detail at hand is because the analysis of the case is such that it would ---- You don't want to know the answer to that question? No. And that's what happened the last time. Clearly, he didn't want to know the answer to that question. I don't think you're in quite that position. But you have made an argument that says investors stand last, and you haven't told us if there's anybody before. So why should we listen to the argument? I'm prepared to assume. First of all, I could supplement this after today with that kind of detail. But I am prepared to assume for purposes of this argument that the list of true creditors, if you will, is very modest, whether it's $100 or $500, a very modest amount of money. Okay? That should be assumed. Let's assume for the moment there are none. We're just talking about investors. And I invite you to proceed with the rest of your argument, because there's important issues there. But I think that changes things, because you have given us an argument that emphasizes the existence of creditors. But, Your Honor, let me illustrate why that really can't be brought into play in how one resolves a given case. Because that knowledge, the assumption of zero or very little, is potentially or here assumed to be sensible, because we happen to be very late in the life of the case. The bankruptcy case, as such, is very old. This exact set of issues on appeal, everything that's before you today, could have, for a variety of other reasons, which may or may not deal with lethargy on counsel's part or any number of other reasons, could have come up very early in the case. We could be here with exactly the same facts of this adversary proceeding, of this appeal, exactly the same dynamics that we've briefed for you months or barely a year into the bankruptcy case. And in the natural life of a bankruptcy case, it is frequently the case that you really don't know who the creditors are until the end of the case. And, frankly, when I started doing this a long time ago, that was de rigueur, simply because the claims resolution as to exactly who's entitled to share really doesn't matter as a practical matter until you have something to share. And, in fact, among other things, the Bankruptcy Code in Section 704 actually makes the point. Does the trustee make more money if we see it your way? No, not at all, because the trustee's fee, to the extent it's described by statute, is a percentage of what he handles and distributes, period. Who he distributes it to is not significant. But what he gets back means he handles more, right? Certainly that's true. Certainly that's true. And it doesn't matter to the trustee whether the money is distributed to other investors or who the identity of the recipients would be. I mean, the question being posed here is, in fact, it does appear to matter, because if your client is given, as the trustee is given, the opportunity to retrieve money from some investors that will ultimately be shared with other investors, that money passes through your client's hands, and, as a result, his fee is going to be larger. And I think the suggestion is made very clearly about Mr. McKenzie, that that's the engine that's driving this case. Well, okay. That's actually, you know, and I apologize for not being as prepared for that question as perhaps I should have been. But I will represent now to the extent the Court believes that the existence, the known existence of allowed creditors somehow matters.  Well, then let me change the question for you and move to the other issues. Is there any authority, and there have been a good number of Ponzi schemes, because unfortunately there's been a lot of litigation that follows it. Is there any authority that supports retrieving money that's been paid out to some investors, for this purpose assume that it was in good faith and the other defenses don't pertain. So some people got money without knowing it was coming out of a Ponzi scheme. Is there any authority for retrieving that money solely for the purpose of redistributing it to other investors who didn't get their money back, that is leveling it out amongst the pool of investors? I don't think any – I'm sorry. I didn't mean to step on you. That's fine. I don't know of any case that has phrased it the way you phrased it. I don't think any case has negated that. I don't think any case has supported that, because the cases don't analyze it that way. The Ponzi scheme cases, if you will, it must be recalled, is really a shorthand for a manner of proving facts in the fraudulent transfer environment is mostly what that is. There is a component of the Ponzi scheme cases in a preference environment, but it's a fraudulent transfer environment, which is state law, statute of Elizabeth, that goes way back. The Ponzi scheme cases have become a manner of, in effect, almost conclusive presumptions about certain factual findings that are part of the fraudulent transfer analysis. So there's not really a law of Ponzi schemes as such. It's fraudulent transfer law where that's the fact. But it seems to me you're asking this court to extend Agritech. I mean, my understanding is it seems that in Agritech, this court concluded that limited partners did not take their distributions in good faith. Therefore, the transfers were avoidable. It seems to me what you're asking the court to do is expand Agritech by deciding that there is no good faith exception for limited partners as a matter of law. No. With due respect, Your Honor, to the contrary, and I'm not sure what you were reading from, but you actually hit the point, what I was going to say, and I'll say it now. The appellee's effort to distinguish Agritech is really a reach, and it's right on that. So I'm not sure if you're reading from the appellant's, I'm sorry, the appellee's brief. I'm reading from my notes. With due respect, this is not an extension of Agritech. That's exactly the point. This is exactly Agritech. And what they've done in an effort to distinguish this case from Agritech is, I dare say, misstate just a little what Agritech actually says. Agritech says when it comes to the part of the opinion on page 540 where this court discussed the payments to the limited partners, it said there was no contention that the limited partners acted in bad faith. There was a good faith standing assumption in Agritech. The Agritech part of the case that we've relied on is just about the exchange of value. It is exactly the same as this case. It's not an extension. And that's what the BAP wrote in the elite branch of this world when the BAP in 2007 had both this court's Agritech decision and United Energies, and it wrote that this court had distinguished one from the other, and Agritech applied for that very reason. There is no difference, and that's my point. It was going to be, frankly, my principal point on the analysis and structure as to how these cases come together, is that there is no difference in Agritech, because while they've said five times in the appellee's brief between pages 20 and 24 that the limited partners in Agritech were not in good faith, in fact, this court wrote in Agritech that they were, and that the only reason that the limited partners in Agritech lost that case was because of the absence of value. And the last thing that they say is that they try and draw a distinction between the limited partners being secondary transferees in Agritech and initial transferees here, and that is a distinction without a difference for exactly the same reason, because each of those transferees in a fraudulent transfer analysis look to establish the giving of value to the person or the party immediately ahead of them in the chain. If they give value, again, there's a bit of wordsmithing. It's not a good faith defense. It's a defense that's comprised of good faith and an exchange of value. Well, I read Agritech a little bit differently than I think you did. I understood it to be saying that within the limited partnerships, and for me the key was we're not talking about the fraudulent entity, we're talking about the recipient of funds from Agritech that gets paid to something called Palm Seedlings A. Right. And the distribution within the limited partnership from the partnership to the individual limited partners was not of value, because it wasn't an exchange. It was a payout to the investors in the enterprise. On their limited partnership interest. The limited partners didn't give anything up in exchange for that. They received that because they were part owners of the limited partnership. There's no exchange there. And that's the same thing that we have here. The defendants in AFI received the payments in question on account of their limited partnership interest. For which, in this case, Mr. McKenzie gave up that interest. He no longer owned it after that point in time. And for which it could be argued he gave up the claim he had against the fraudulent entity. The distinction there in my mind is that there's not an allegation that Palm Seedlings A was the fraudulent entity. It was the Agritech operation that was the Ponzi scheme there. A couple of points. Hopefully I can capture them all, because you made three points that I had here. So I thank you for that. Number one, the appellee has said that the Palm Seedlings initial transferee was part of the fraud. And the appellee has said that the limited partners were bound by that problem. Now, if that's correct, then Mr. McKenzie, who individually is assumed to be in good faith, is likewise bound by the transfer to his partnership that he received. Because it's equally fraudulent. But the real answer, the real point that Your Honor made is that the fact that this case, let me say two things. I'm sorry. That McKenzie was paid in full for his interest can't distinguish the case if he had been paid $10 less than the total value of the interest. That's legally got to be the same thing. So the fact that he gave up 100 percent of his partnership interest because there happened to be enough money on hand at that moment to give him 100 percent of his entitlement, as opposed to 95 percent, which would have been somehow more on account of, as opposed to in exchange for, has to be a distinction without a difference. The point is that he received the money not upon a claim, and I'm going to come back to that last point in a moment. He didn't receive the money on account of a creditor's claim. I think that was me. No, it wasn't. He didn't receive the money on account of a creditor's claim. He received it on account of an equity investment. That's the point. Whether you received 100 percent of it, 101 percent of it, or 95 percent of it has to be a distinction without a legal difference. The last point you made. Let me ask you a question, and I think you're talking about this, but I'm going to Judge Anderson's opinion, specifically page 5 at Excerpt 437, and he talks about Agritech, as you well know, and then he said specifically the limited partners received the distribution only because they were limited partners. Here, by contrast, McKenzie received the transfer because he was ending his involvement in the partnership. By receiving the transfer, he exchanged partnership interest for a proportionally reduced restitution claim, citing United Energy. AFI, therefore, received reasonably equivalent value in a way that the debtor in Agritech did not. Moreover, McKenzie's exchange of his partnership interest for a reduction in his restitution claim resulted in McKenzie taking for value in a way that the limited partners in Agritech, who merely received the distribution as limited partners, did not. What's the problem with that analysis? The problem is the following, and, Your Honor, and I guess we have lost the video. Don't worry about the video. But that is exactly where I was going. The first point you made is the same one that Judge Clifton made, which is the distinction between paying 100% and some fraction less than that. And I reiterate that that needs to be a distinction without a legal difference. The second point was exactly the one I was going to move to, which is the following. And that's the one that the BAPT decided and explained in the elite opinion. And the difference is the following. What United Energy might mean in this context is that there may have been, and we can assume, although it really wasn't found, the fact is the fact was found, as the BAPT also noted, that the payment was on account of the limited partnership interest. That's the fact in the case, not that it was in exchange for a restitutionary claim. But nevertheless, for analysis purposes, what United Energy might say is that in every case, there's a restitutionary claim somehow in addition to the equity investment. But what the BAPT explained in elite, which, of course, my point is out of AFI, is that that restitutionary claim is of the same rank as the equity investment that it substitutes for. And the reason they did that in United Energy is because there was no claim at all, because the transferor debtor had no business. If you go back and read United Energy's carefully, what you'll find is that the entity that the defendant paid money to is not the same entity that actually paid the money to the defendant. So the restitutionary claim in United Energy's filled that gap. Here, there was a preexisting relationship between Mr. McKenzie and AFI all along. So if you add a restitutionary right, you essentially add nothing that changes the equation, because under the analysis that the BAPT did and the application of the principles of 510B of the Bankruptcy Code, that restitutionary right is just as subordinated as the equity investment that it would replace or that it would duplicate. And so, therefore, the payment on account of the restitutionary right that's subordinated does not reduce the pool of creditors. It doesn't reduce the pool of creditors, which is the point we opened with, that Judge Clifton asked me about. Because there's no payment that reduces the creditor pool, other creditors are not benefited. To pay someone who is in the lower tier, whether they're in the lower tier because they own a stock or a limited partnership interest or because they own a restitutionary claim that's subordinated, again, is a distinction without a difference. It is a payment to a lower tier, and fraudulent transfer law looks at reduction of creditors' claims. That's the – that's exactly how these cases fit together. That's exactly what the BAPT did when it had both United Energies from this Court from 1991 and Agritech from this Court from 1990. The BAPT in Elite had both of those cases, and that's exactly how it harmonized the situation because it doesn't quite use these words, but the point is it assumes, as Judge Trock just did, the BAPT in Elite assumed that there was a claim in favor of Elite, just as we can assume that there's one in favor of Mr. McKenzie. The point is that doesn't elevate his position. It simply adds to it or duplicates it. It doesn't elevate it, and therefore the payment is still on a lower tier, lower-ranking interest. And that's what this Court said in Agritech is not for value. So whether the limited partnership – Thank you. May it please the Court. I think the panel is perceiving the fundamental problems with the case of Appellant. What I would like to do is I would like to frame very briefly what I think is the fundamental problem with the case of Appellant. some of the circumstantial elements that I think will enable the panel to understand the nature of these arguments and how they reach the Court. Appellee McKenzie is one that represents one of 27 cases in which there are common issues of fact and law. Twenty-five of those are currently on appeal at the district court. Two similar cases were previously dismissed by this Court because of concerns regarding the finality of the remand orders. The Court retained jurisdiction over this particular matter. The McKenzie case does not reflect the full spectrum of issues that were briefed in the Court subsequently. Each of these cases proceeded, as indeed all of the cases that were filed by the trustee, proceeded on separate distinct tracks in the bankruptcy court and then ultimately on to appeal. So McKenzie's case is really, though not a technical lead case, having not been designated as such, is a surrogate case for these other victims, many of whom are true victims, who suffered net losses as a result of their dealings with AFI. McKenzie was one of the lucky ones who received a return of his capital and a false profit. He's in front of the payout line and he's in front of the courthouse line. That's right. But he's not the only person in line. That's right. That's right. And what defines this case, and indeed I think what will help to resolve some of the perplexing issues raised by appellant's rationale, is the recognition that this case is first and foremost a securities fraud case. That's really what it's about. And the recognition of it as a securities fraud case and the way in which it became designated as such and was shaped as such I think is very pertinent. The former trustee in this case, and I will mention also in terms of mentioning related matters and the procedural posture of this case, presently pending before the court, is the appeal of the former trustee who initiated all of these lawsuits from an order removing her as the trustee. We had requested that the court set those matters before a common panel. Apparently that was not granted, but I want to underscore that fact because it is pertinent to understanding the way in which the case became a securities fraud case and the role that the trustee ultimately played in that. The former trustee, Carolyn Dye, participated with the SEC and worked with the SEC in the investigation of the perpetrator, Gary Eisenberg. Ultimately a plea agreement was reached and a settlement with the trustee. That plea agreement then served as the springboard for the creation of the Ponzi scheme litigation. And that was significant, and significant in the case of McKenzie and of all the other investors, because as is the case in this circuit's precedent, the use of the Ponzi, of the plea agreement, to establish the actual intent to hinder, delay, and defraud was preclusive. In other words, the investors were not allowed to challenge the issue of whether there was an actual intent to hinder, delay, and defraud. The Ponzi, the plea agreement was used preclusively against them. Now, while we recognize that this is consistent with recent authority in this court, that is assuming that the Ponzi, that the plea agreement bears the indicia of reliability that frankly was absent here, and was absent here because of the relationships that the former trustee had with the Ponzi enterprise. It's not clear to me where you're going with this. Your Honor, if I may, I understand. The point of this argument is to underscore that in McKenzie's appeal, separate and apart from the issue of whether he was an investor and where he stood in line vis-a-vis creditors, he was also precluded from challenging the fundamental premise of whether this was a Ponzi scheme that would support findings of actual intent to hinder, delay, and defraud. And if we accept that, what's the consequence of it? I think the consequence is finding a reversible error in that he was not allowed to address or challenge the issue of whether transfers made to him at the beginning of the enterprise were made with actual intent to hinder, delay, and defraud creditors. Separate and apart from the issue of whether they were creditors. You're playing with fire, though. But what happens if it's determined that your client made the investment at a time when it was still a legitimate business enterprise, fell on hard times, it's not unheard of for businesses to suddenly do bad things when they fall on hard times, and so then the fraud starts and your client's paid out at a time and receives the money at a time when it's become a Ponzi scheme. But he doesn't have a front-end claim because at the time he made his investment, he wasn't defrauded. It was a legitimate business. I'm not sure in the end you're going to get yourself to a better position than what we're dealing with right now. I understood, Your Honor. That is certainly a potential outcome. The point of this position is to underscore the way in which virtually every presumption was made against the investors. And this is one that is obviously a very significant one since it has given preclusive effect as to all of the investors. But I understand that position. I do think, though, it is an area where the bankruptcy court's decision in this case and subsequent cases was erroneous. And it is completely dependent upon the issues related to the unique disabilities of this trustee in evaluating the case for litigation and embarking upon the litigation program that she did in this case and that has resulted in the level of complexity and expense that now as we see today results in litigation in essence being advocated solely for the benefit of administrative creditors. Moving on to – Well, so just so that if you were able to challenge the plea agreement, then would that be where your argument would fit in that you would get more than the $73,400? Is that – Not necessarily. I mean, I haven't framed it in that regard. I think what it would do, it would give McKenzie, at least, and certainly the other investors, the opportunity to look at the testimony of Gary Eisenberg. That testimony was given. And it was very clear that he never had the intent to hinder, delay, and defraud creditors. In fact, most creditors were paid. As the panel recognized, ultimately there were $108.56 of claims. Well, I guess he shouldn't have pled guilty then, huh? Well, I guess that is – I'm not a criminal lawyer, but I can certainly recognize that he may have had some issues as well. In any event, moving on to the analytical issues that inform the application of Agritech when contrasted with United Energy, I want to reemphasize that this case is ultimately a securities fraud case, as positioned by the trustee. United Energy is a case that is a securities fraud case. Agritech is not. Agritech is a case that really is predicated upon pure fraudulent transfer concepts. And we would differ fundamentally, as is reflected in the papers, on whether Agritech was a case about reasonably equivalent value. There certainly was some mention of it. But the real analytical fulcrum in that case was the issue of good faith, of good faith. And, indeed, by looking at Agritech as a case that is about good faith and one in which it was very clear that the district court concluded in various different ways that the recipient partnership acted as an actual participant in the Ponzi scheme and lacked fundamental good faith, by doing that is the only way to harmonize it with United Energy. Well, I have to pause here because I'm in the rare circumstance of actually knowing something about one of the cases because I live in Hawaii, and Agritech was, as you can imagine, big news in the business community in Hawaii. And there were, in fact, security fraud claims brought and ultimately settled. So the structure of the two enterprises were different. But I guess I don't really understand the distinction because the limited partners in Agritech, in this case the ones that invested via Palm Seedlings and the dozens of others, they did sue. And they said exactly the same thing that other security fraud plaintiffs say. We were duped. We were gotten into these investments with these false and misleading statements and these omissions and so forth. So what's really the difference? Well, I think it's the point that you raised, Judge Clifton, earlier, which was the point that to the extent that they might have those claims, and the published decision, Agritech, that we have before us doesn't go into that detail. But to the extent that they would have those claims, it would be against a non-debtor party who was a participant in the actual perpetration of the Ponzi scheme. And Agritech was a party to that, too. Because of the bankruptcy filing, it took a different form, and they emphasized trying to collect from accounting firms and law firms and individuals that didn't have very much. But Agritech was certainly part of the mix. Let me – I've indicated before my concern for the identity of this whole creditor versus investor. Suppose we have other creditors, I mean, real creditors, trade creditors, people that AFI owes money to not because they were hoping to gain from an investment, but because they were doing business with AFI. Why don't they stand superior to somebody whose claim may take the form of a fraud claim and hence take the form of a creditor's claim, but in fact springs from something very different, springs from something that was intended to produce an investment gain but didn't because you were fooled? I mean, people that invest are at risk in lots of forms. One of the forms is the possibility of having been defrauded and making the investment. That doesn't make them the same thing as the vendor that sold them paper or the landlord that's provided their office facilities. Why shouldn't the investors simply be treated categorically different, whatever form their claim takes? Yes. So assuming that there were such creditors, the question would then be why not subordinate them? After all, the Code does have Section 510B that talks about the subordination of those claims in the context of distributions under the Code scheme. And I think why that's important, an important distinction, is to recognize that the body of law that informs what we're discussing here in the affirmative defenses is fraudulent transfer law, which indeed goes back to the statute of Elizabeth and even prior to that to the Justinian Codes. And in that context, there is a long line, an established strain of authority that clearly recognizes that one who receives property in satisfaction of an antecedent debt has given value. And in the context of the Ponzi cases, it's what I would call, and it's manifest in many of these cases, a victim's dignity rule, which is that if you are lucky enough to receive what you put into such an enterprise and you did not act with culpability and you did not act in cooperation, knowing culpable cooperation with the Ponzi enterprise, you are allowed to keep that. And that's, in effect, the premise. But why allowed to keep it as against the landlord or as against the paper company? It's easy to understand perhaps as against other investors that were later in the game. But why against somebody who wasn't seeking and wasn't ever in line for profit through the success of the enterprise but was simply doing business with the enterprise? There certainly is appeal to that proposition at some level. But it simply isn't what the law is, Your Honor. It's not as Congress has envisioned it in articulating a distribution statute on the one hand under 510B and adopting the law of fraudulent transfer. In the law of fraudulent transfer, there is no subordination of equity fraud claimants. They have claims, claims pure and simple, as defined under the Bankruptcy Code, which is the broadest form of a statement of the right to recovery on an obligation imaginable. And the authorities, historically in antedating the creation of Ponzi scheme, clearly recognized that when one has an antecedent debt, whether it be a debt evidenced by a written obligation, some sort of concrete consensual obligation to the parties, or an implied claim that would arise as a result of equitable principles that allows a victim to have restitution, that they are then allowed to keep that, subject to one area in which there is an ability for recovery, and that is the area of preference. Preference is a different kind of concept. Preference seeks to achieve equality of distribution in precisely the way the trustee is attempting here. But in this case, the trustee is attempting to do so in a manner that is excessive and considerably beyond the limits of what Congress envisions in the enacting of the preference statute of Section 547, which is a 90-day preference reachback period. Here, the trustee takes the position that he acts as the sovereign and can step into the shoes of the SEC. That's the argument that was given there. And therefore, avoid any statute of limitations and reach back indefinitely in time to recover every payment that was ever made for the purpose of accomplishing equality of distribution. So I think that that underscores the one area in which the established law would allow for some level of recovery is the preference area, the true preference area. But in terms of what would I mean, the preference area has defenses, too. It does. I'm not sure that I understand. I'm not sure this is the core of the case, but I don't know that I understand how that really changes things, because presumably your client, if it wasn't outside the time period, would still seek to retain what he had been paid on the basis of not having any participation, collecting in good faith, so on and so forth. Yes. There is no good faith defense to the preference action. It's more or less a strict liability. So the idea is going back a certain period of time with the objective of creating equality of distribution. That really is the objective there. And I would also note that another element of the case that underscores what is a structural anomaly and what is extremely difficult and I think ultimately impossible for the trustee to explain is the notion of being able to step into the SEC's proof of claim, a creditor claim predicated upon obtaining restitution for victims, the trustee then claims does not have claims, does not have creditor claims. So we can see a little bit of the irony of that position and that it doesn't, it does not work in that case. And ultimately, the SEC withdrew its proof of claim in this case, as did FedEx, thereby, you know, further suggesting that any true class of creditor claims that could argue for some sort of concept of subordination, which is not, is simply not addressed in the authorities, is unlikely to exist, is unlikely to exist. And therefore, the case is clearly being handled and being handled in a way that I would say is excessively complex and duplicative and expensive for the benefit of administrative claimants. And I think that relates also ultimately to the concept under Section 550 of the Code that required the bankruptcy court to look at these issues, at the totality of circumstances, and decide, notwithstanding that a particular transfer might be avoidable, decide whether it should be recoverable from the party who had received it. And the focus point of that inquiry is whether there is a benefit to the estate, a benefit to the estate. And when one looks, you know, through the prism of what the structure of this case is and what really is being done is an effort to equalize losses between partners inter se. I don't believe that discretion was served by allowing for recovery from McKenzie or indeed from any of the other investors. Either it was being, the litigation and the recovery was being sought for the benefit of $108 in dubious credit claims, dubious, because remember, the Federal Express proof of claim was filed late at the request of the trustee and then withdrawn. So you really had the letter of a software provider into it written at about the time of the filing of the bankruptcy when there was plenty of money in the estate to pay the roughly $50 that was owed. Either that serving as the basis for the recovery or this hyper-preference, which is inconsistent with the congressional regimen and scheme for the recovery of preferences, which would look only 90 days, not seven years, eight years, nine years, which is what has occurred in this case. Fraudulent transfer law being used as, in effect, a concealed preference, a hybridized preference type of recovery. It's clearly not supported in the historical authorities that undermine fraudulent, that underlie fraudulent transfer law, and certainly not supported when evaluated in the context of what Congress has said is the appropriate reachback period to recover preferences. To achieve the trustee's objective articulated here, which is equality of distribution. Counsel, I have a question. Let's assume, just for the sake of discussion, that we were to agree with Judge Anderson. Where does that leave your cross-appeal? The cross-appeal with respect to the interest, I believe the cross-appeal was filed with respect to the award of interest by the bankruptcy court. And that award, if we were to agree, if you were to agree with Judge Anderson, there would be no basis for an award of interest, because there would be no judgment awarded. And I think that that would dispense with that. And that's all your cross-appeal is now about? Yes, it is. Thank you. Thank you. I'll give you a couple of minutes. At the risk of speaking staccato, I do want to make a couple of responsive points. Again, with apologies for not having had figures, I can represent to the court, and I can provide by judicial notice or such other supplements that it might allow. There was, for example, a land work claim. I now recall that from many years ago. I know that of personal awareness. There were allowed other claims. I don't remember the magnitude. I do remember them being in the proverbial low six figures. But there were other claims. I don't know their exact status, whether they've been withdrawn or otherwise. But there were other claims. So I did want to answer that question directly. But I also want to point out that this case is not a referendum on the prior trustees, it's not a referendum on the current trustee. That, if it exists at all, it's either in the other matter, where the first trustee was removed, and whether she was appropriate, inappropriate, that's where there's a referendum on her subjective actions. And to the extent there's going to be a referendum on the current trustee, it's going to come up in his fees. It's going to come up in his closing report of the case. This case is circumscribed by plaintiff versus defendant rights and liabilities, and one's sort of personal subjective view of a plaintiff versus defendant rights. And I think that this judgment has nothing to do with the lawsuit confines. And as a matter of fact, this Court has written, and I will find the citation if the Court would entertain it. This Court has written because in the post-confirmation Chapter 11 cases, their avoiding powers are preserved and their questions have been raised, well, if the creditor body is fixed and been paid, why are there avoiding powers later because the recovery provisions talk about for the benefit of the estate. And this Court has written, I don't have the citation at hand, but I am certain this Court has written that as long as the money is going to the estate, what the estate is obliged to do with it, and whether it goes to lawyers or it goes to court costs or it goes to the Sparkletts Water Fund, is not relevant to the rights within the confines of the lawsuit. Those are separate issues. And in order to ---- No, I understand that. But when the argument presented is one that emphasizes the role of investor and the bottom of the barrel status of an investor, it seems to me to make a practical difference as to whether everybody else in the room is also another investor. Well, at some level, if one is going to wonder or opine or criticize the trustee for ---- I'm not talking about trustee. There's a whole separate argument about the trustee. The question belongs here, too, though, because if you make an argument, too, as you have done, that says investors are last, we have to treat them last and treat all the payments to them as investor-type payments, then I think there is a question about whether, yeah, that's right, they're last, but only if somebody else is in the room that stands in front of them. And I would close with the following. In order to distinct ---- in order to rule for the appellees here, I submit that this Court has to either overrule Agritech, ignore it, or rule that it only applies when the separate record determines that there are trade creditors in the case, presumably at the time that the Court is ruling. That is the ---- I dare say the litmus test to that issue that Your Honor has raised. And I understand the contextual concern it might raise, but there are lots of contextual and industry, if you will, issues that surround ---- depending upon whose ox is being gored, there are lots of issues that people can raise about whether the defendant is sympathetic, whether the plaintiff is aggressive, whether the plaintiff is formulaic. There are any number of issues that one can raise in the context or to the subjective nature of the persona. This Court, among others, has made a point of distinguishing those sorts of things and leaving those to the administration of the case as distinct from the legal rights and responsibilities. Otherwise, you have no doctrines. You have cases ---- you have legal doctrines that are driven by the curiosities of the facts and the curiosities of the sequence. As I said, if this case was one year into the bankruptcy case, it would look very different. From a creditor's roster standpoint, creditor registers in bankruptcy cases have all sorts of sometimes absurd entries on them for millions of dollars, whether it be based on fraud or based on shipments that were not received or not paid for. Any countless things show up on bankruptcy court claim registers. And to judge these sorts of cases by the status of the claims register at the moment in time that the question is arising, it would be very different if the bankruptcy court, the trial court, took it into account and we came to the appellate court so many years later. We'd otherwise be obliged to leave the claims register untouched so that none of the claims matters would be resolved and this court, the higher courts, would have the same circumstances. That's what ---- I think we have the argument. We thank you for it. We thank both counsel for the argument. The case just argued is submitted as all the cases on today's calendar and we are in recess.
judges: Trott, Clifton, Callahan